UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-80001-Rosenberg/Reinhart

UNITED STATES OF AMERICA

v.

ESTON EUREL MELTON III,

Defendant.

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and Eston Eurel Melton III ("the defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to the Information, which charges the defendant with Attempt to Evade and Defeat Tax, in violation of Title 26, United States Code, Section 7201.

2. The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that

the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of five years, followed by a term of supervised release of up to three years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000 and may order restitution as a condition of supervised release.

4. The defendant further understands and acknowledges that, in addition to any sentence imposed under the previous paragraph of this agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

5. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations

contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will move for an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines. The United States further agrees to recommend that the defendant be sentenced at the low end of the guideline range, as that range is determined by the Court. However, the United States will not be required to comply with this paragraph if the defendant: (1) fails or refuses to make full, accurate, and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7. This Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

a. *Base offense level:* The amount of tax that the taxpayer owed and did not pay, including penalties and interest, is more than $1.5 million but not more than $3.5 million.

Therefore, the defendant's base offense level is 22 pursuant to sections 2T1.1(a)(1) and 2T4.1(I) of the Sentencing Guidelines.

    b.    *Sophisticated Means*: The parties do not agree whether the defendant's offense level should be adjusted upward by two because the offense involved sophisticated means pursuant to sections 2T1.1(b)(2) of the Sentencing Guidelines. This issue is to be resolved at sentencing.

    c.    *"Zero-point" adjustment*: The defendant meets the criteria set forth in section 4C1.1(a)(2) through (10) of the Sentencing Guidelines. Therefore, if the defendant is found to have zero criminal history points, he will be eligible for a two-point adjustment pursuant to section 4C1.1(a) of the Sentencing Guidelines.

    d.    *Adjusted Offense Level*: Before adjustment for acceptance of responsibility, and if the defendant is found to have zero criminal history points, the applicable adjusted offense level under all of the circumstances of the offense committed by the defendant is either Level 22 (if the Court finds that the offense involved sophisticated means) or Level 20 (if the Court does not find that the offense involved sophisticated means).

8.    The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office, or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its

entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

9. This Office and the defendant agree that the following statement of facts is accurate and provides a factual basis for the defendant's plea of guilty.

### Tax Returns, Payments, and Collections

a. For the tax years listed below, the defendant filed tax returns on the dates indicated, acknowledging that he owed the amounts of tax indicated. To date, he has made tax payments in the indicated amounts. In addition, the IRS has collected the indicated amounts through liens and levies.

| Tax Year | Return filing date | Tax due | Taxes paid | Liens and levies |
|---|---|---|---|---|
| 2005 | 2/4/2008 | $131,131 | $6,000 | $320,301 |
| 2006 | 7/28/2008 | $112,806 | $4,000 | $216,425 |
| 2007 | 10/15/2008 | $120,563 | $1,000 | $0 |
| 2008 | 10/15/2009 | $153,391 | $0 | $0 |
| 2009 | 10/13/2010 | $139,499 | $0 | $0 |
| 2010 | 10/15/2011 | $157,588 | $5,000 | $505 |
| 2011 | 10/18/2012 | $146,438 | $5,000 | $0 |
| 2012 | 10/9/2013 | $94,588 | $0 | $0 |
| 2013 | 10/14/2014 | $128,319 | $3,000 | $0 |
| 2014 | 10/14/2015 | $129,517 | $38,100 | $0 |
| | | $1,313,840 | $62,100 | $537,231 |

### Residence 1

b. Until November 2018, the defendant lived in Residence 1, which was located in Miami-Dade County. Beginning in 2008, revenue officers placed liens on Residence 1 based on

5

the defendant's unpaid taxes. On May 9, 2011 and January 10, 2012, a revenue officer warned Melton that, if he did not sell Residence 1 voluntarily, the IRS might levy (seize, or foreclose on) the residence.

      c.      On May 4, 2012, an accountant representing the defendant sent the IRS a fax stating that Individual 3 was the defendant's realtor.

      d.      On May 31, 2012, the defendant signed a listing agreement authorizing Individual 3 to sell Residence 1. The defendant caused to be crossed out the provisions of the form allowing Individual 3 to list the property in the multiple listing service ("MLS") for the locality, to advertise the property, to put up "for sale" signs, and to provide information to other real estate agents; the defendant also caused to be crossed out the provision requiring that the defendant make the property available for showings and inspections. Individual 3 recommended an asking price of $1,750,000, but the defendant specified an asking price of $2,425,000 in the agreement. The defendant caused to be added language stating that, on November 1, 2012, the crossed-out provisions "will become applicable" and the price would be reduced to $1,750,000.

      e.      On December 12, 2012, Individual 3 listed Residence 1 in MLS for $1,750,000. On December 19, 2012, at the defendant's direction, Individual 3 increased the price to $2,425,000.

      f.      On January 21, 2015, the government petitioned to levy the defendant's residence in Case No. 15-20234-CIV-Lenard (S.D. Fla.).

      g.      On February 20, 2015, the defendant entered a contract to sell Residence 1.

h. On February 26, 2015, the defendant wrote a letter to the government requesting that the government not levy Residence 1 because the levy "will needlessly delay the closing transaction and payment of my debt." On February 27, 2015, the defendant asked his accountant to "follow up with [the Revenue Officer assigned to his case] and do our best to get this hearing [on the government's petition to levy the house] cancelled." The defendant wrote that the hearing was "not necessary" because "[t]his transaction is going to close and do so promptly." On March 3, 2015, a government attorney wrote to the defendant's accountant that the government would go forward with the petition. The attorney added, "Recall that our Petition is merely for judicial *approval* of a proposed levy. No levy has been made yet. It will be for [the Revenue Officer] to decide whether or not to levy on Mr. Melton's residence if our Petition is approved. She would have no need to do so if Mr. Melton is able to sell the property under his own auspices, and remits the proceeds to the Service to satisfy our liens."

i. On March 9, 2015, the court granted the government's petition to levy Residence 1. However, the IRS did not levy the residence.

j. Beginning in February 2015 and continuing through May 2016, the defendant entered five contracts to sell Residence 1, including the contract discussed in paragraph g. All the contracts fell through, that is, they resulted in no sales.

k. The defendant's fifth contract to sell Residence 1 was with Individuals 4 and 5. On or before May 18, 2016, the defendant directed his accountant by email to "bring [the new Revenue Officer assigned to the defendant's case] current on the sale of the home, this time with far greater likelihood of a closing near-term than the previous potential buyers."

7



l.  Because the value of the IRS liens exceeded the sale price of Residence 1, the defendant needed approval from the IRS to sell the residence. The defendant's sales contracts included deadlines for the defendant to obtain this approval. The defendant did not obtain the necessary approval in time to satisfy the contract with Individuals 4 and 5. Individuals 4 and 5 offered to extend the deadline in the contract, but the defendant did not do so, allowing the contract to expire instead.

### Global Projects

m.  Global Projects, Inc. was incorporated in Florida in 1995. Beginning no later than tax year 2006 and continuing through tax year 2019, Global Projects filed Federal Schedules K-1 indicating that the defendant owned 100% of the corporation. Global Projects primarily provided lobbying services in Miami-Dade County. The defendant provided most or all of these services.

### Cash Transfers to Individual 2

n.  Individual 2 was a close family member of the defendant. The defendant lived with Individual 2 and they shared household expenses.

o.  Between March 8, 2016 and September 10, 2019, the defendant signed checks made out to himself from the Global Projects account that were negotiated for cash. Shortly after the checks were cashed, the same or similar amounts were deposited in cash into personal bank accounts on which Individual 2 was the sole signatory. 67 such deposits were made to Individual 2's accounts, for a total of $81,906.

### Bankruptcy

p.  On February 12, 2017, the defendant filed a Chapter 11 bankruptcy petition. The IRS suspends collection efforts when a taxpayer declares bankruptcy, and it did so in the defendant's case.

q.  On March 7, 2017, the defendant and his attorney met with a trial attorney with the Office of the U.S. Trustee, as required by 11 U.S.C. § 341 (a "341 meeting"). When the trial attorney asked the defendant about Global Projects, the defendant said, "That's me. . . . That's between my ears." He stated that he was the sole employee.

r.  On February 24, 2018, the IRS filed a proof of claim in the defendant's bankruptcy case, reporting that the defendant had a tax debt of $2,143,381.18 (including penalties and interest).

s.  On April 16, 2018, the defendant sold Residence 1 for $1,358,000. After satisfaction of two prior liens, the IRS received $535,093.25. This money was used to fully pay the defendant's 2005 taxes and to partially pay his 2006 taxes. The defendant did not receive any of the proceeds.

t.  On May 12, 2018, the defendant moved to dismiss his bankruptcy petition. On July 24, 2018, the motion was granted.

### Gryphon Partners

u.  Gryphon Partners, Inc. was incorporated in Florida on March 15, 2017. Beginning with tax year 2017 and continuing through no earlier than tax year 2022, Gryphon Partners filed Schedules K-1 indicating that Individual 2 owned 100% of the corporation. On March 27, 2017, Gryphon Partners opened a bank account. Individual 2 was the sole signatory.

v.  Gryphon Partners primarily provided lobbying services in Miami-Dade and Palm Beach Counties. The defendant provided most of these services. When Gryphon Partners was incorporated, Individual 2 was not registered as a lobbyist in Miami-Dade County. She registered in 2020. Individual 2 first registered as a lobbyist in Palm Beach County in 2024.

w.  Gryphon Partners began receiving revenue in 2017, which rose thereafter. After 2019, Global Projects' revenues fell substantially. Therefore, Gryphon Partners' share of the two corporations' joint revenues rose, and Gryphon Partners received almost all such revenue after 2019. The corporations' bank records reveal revenues as follows.

|  | Global | Gryphon | Total | Gryphon % to total |
|---|---|---|---|---|
| 2016 | $607,701 | $0 | $607,701 | 0% |
| 2017 | $483,700 | $71,000 | $554,700 | 13% |
| 2018 | $587,145 | $103,174 | $690,319 | 15% |
| 2019 | $604,580 | $281,775 | $886,355 | 32% |
| 2020 | $36,000 | $661,957 | $697,957 | 95% |
| 2021 | $36,000 | $557,227 | $593,227 | 94% |
| 2022[1] | $0 | $402,260 | $402,260 | 100% |

x.  The bank records also reveal that much of Gryphon Partners' revenue was received from clients who had previously been clients of Global Projects.

|  | Revenue from Global clients | Revenue from Other clients | Total Revenue | Global clients % to total |
|---|---|---|---|---|
| 2017 | $70,000 | $1,000 | $71,000 | 99% |
| 2018 | $64,000 | $39,174 | $103,174 | 62% |
| 2019 | $215,425 | $66,350 | $281,775 | 76% |
| 2020 | $600,957 | $61,000 | $661,957 | 91% |
| 2021 | $489,727 | $67,500 | $557,227 | 88% |

---

[1] Through September 30, 2022.

10

|  | Revenue from Global clients | Revenue from Other clients | Total Revenue | Global clients % to total |
|---|---|---|---|---|
| 2022[2] | $237,260 | $165,000 | $402,260 | 59% |

y. The bank records also reveal that, over time, Global Projects reduced its distributions to the defendant and increased its distributions to Individual 2. Gryphon Partners made distributions to Individual 2,. but almost none to the defendant. Therefore, by 2019, Individual 2 was receiving almost all the corporate distributions to the two individuals.

|  | Defendant Global | Defendant Gryphon | Individual 2 Global | Individual 2 Gryphon | Total Defendant | Total Ind. 2 | Grand Total | Defendant % |
|---|---|---|---|---|---|---|---|---|
| 2015 | $3,500 | $0 | $0 | $0 | $3,500 | $0 | $3,500 | 100% |
| 2016 | $152,593 | $0 | $28,270 | $0 | $152,593 | $28,270 | $180,863 | 84% |
| 2017 | $131,949 | $0 | $30,900 | $13,705 | $131,949 | $44,605 | $176,554 | 75% |
| 2018 | $76,610 | $0 | $84,209 | $101,853 | $76,610 | $186,061 | $262,671 | 29% |
| 2019 | $13,777 | $12,341 | $187,038 | $70,568 | $26,117 | $257,605 | $283,723 | 9% |
| 2020 | $170 | $2,559 | $11,500 | $243,814 | $2,729 | $255,314 | $258,043 | 1% |
| 2021 | $0 | $0 | $27,400 | $153,581 | $0 | $180,981 | $180,981 | 0% |
| 2022[3] | $0 | $0 | $795 | $101,819 | $0 | $102,615 | $102,615 | 0% |

**Residence 2**

z. On November 27, 2018, Individual 2 bought Residence 2, which was located in West Palm Beach. Individual 2 took title solely in her name. The defendant and Individual 2 moved from Residence 1 to Residence 2.

aa. Individual 6 was an associate at the title agency, located in Palm Beach County, Florida, that assisted with Individual 2's purchase of Residence 2. On November 2, 2018, during the preparations for the purchase, Individual 2 emailed Individual 6 and cc'd the defendant and others. Individual 2 wrote that she did not want the defendant on the deed. The same day,

---

[2] Through September 30, 2022.
[3] Through September 30, 2022.

11

Individual 6 replied that the defendant would still have to sign the deed. On November 5, 2018, the defendant replied to Individual 6, without cc'ing anyone. The defendant wrote,

> [P]lease find this in your in box and hit Reply to All with this message:
> Hello [Individual 6]:
> I am purchasing [Residence 2] with my own funds and in my name only. If you would like Dusty [the defendant] to sign the mortgage and/or promissory note alongside me, that would be fine. But Dusty will not be on title.
> Thank you,
> [Individual 2]

The same day, Individual 6 replied to the defendant that she was "a little confused by your message[,]" but agreed that the defendant only had to sign the mortgage, not the deed. The defendant replied, "My apologies [Individual 6]. I was ghostwriting for [Individual 2] . . . . I'll try a second time!" The next day, November 6, 2018, Individual 2 replied to Individual 6's email of November 2. Individual 2's email to Individual 6 was substantively identical to the defendant's first email of November 5, 2018 ("I am purchasing [Residence 2] with my own funds" etc.). The defendant intended to send that email to Individual 2, not Individual 6.

      bb.    Individual 2's paid $175,050.61 cash to close on Residence 2. Of that sum, $37,234 (21%) was proceeds of Global Projects and $80,526 (46%) was proceeds of Gryphon Partners.

### Defendant's checking account

      cc.    On December 31, 2018, the defendant and Individual 2's joint checking account was closed. The defendant was not a signatory on any remaining personal bank accounts.

### IRS collection efforts, 2019 through 2021

      dd.    On July 23, 2019, a new Revenue Officer mailed the defendant a letter at Residence 2 informing the defendant that the IRS still intended to collect the debt from his 2006

12

through 2014 taxes. The letter also informed the defendant that, as of July 23, 2019, his debt for those years, including penalties and interest, was $1,780,423.36.

    ee.    Thirteen days later, on August 5, 2019, the defendant sent letters to three clients of Global Projects. Each letter stated that

> responsibility for and supervision of my existing consulting services for you . . . will be assumed by [Individual 2]'s Gryphon Partners, of which she is President and I am Chairman. I will continue to be your primary political asset and point of communication, but [Individual 2]'s company will become your client relationship . . . .

Two of the clients were located in Miami, Florida. The third was located in Deerfield Beach, Florida.

    ff.    Shortly after the Revenue Officer mailed his letter of July 23, 2019, Global Projects' revenue decreased substantially and Gryphon Partners' revenue increased substantially.

|  |  | Global Projects | Gryphon Partners | Total | Gryphon % to total |
|---|---|---|---|---|---|
| 2019 | April | $41,892 | $0 | $41,892 | 0% |
|  | May | $71,890 | $0 | $71,890 | 0% |
|  | June | $64,395 | $10,000 | $74,395 | 13% |
|  | July | $76,391 | $0 | $76,391 | 0% |
|  | August | $63,787 | $2,000 | $65,787 | 3% |
|  | September | $57,546 | $53,345 | $110,891 | 48% |
|  | October | $20,040 | $43,845 | $63,885 | 69% |
|  | November | $43 | $74,595 | $74,638 | 100% |
|  | December | $10,000 | $87,889 | $97,889 | 90% |
| 2020 | January | $3,000 | $55,900 | $58,900 | 95% |
|  | February | $3,000 | $67,549 | $70,549 | 96% |
|  | March | $3,000 | $62,820 | $65,820 | 95% |

    gg.    On February 4, 2020, the Revenue Officer left a summons on the front door of Residence 2 requiring the defendant to attend an interview on February 18, 2020.

13

hh.     The defendant was the owner of and insured person on one adjustable-life and three whole-life insurance policies. On February 11, 2020, seven days after the Revenue Officer left the summons, the defendant transferred ownership of the policies to Individual 2. At the time of the transfer, the cash value of the four policies was approximately $51,419.

ii.     The defendant owned a 2010 Cadillac SRX and a 2010 Mercedes C350. On February 12, 2020, eight days after the Revenue Officer left the summons, the defendant transferred title to the cars to Individual 2 for $10 each.

jj.     On February 18, 2020, the defendant appeared for the interview with the Revenue Officer at an IRS office in West Palm Beach, Florida. The defendant provided the Revenue Officer a completed Form 433-A (Collection Information Statement). On the form, the defendant wrote that Gryphon Partners was his only employer and that he earned $3,000 per month. He wrote that he had no bank accounts and that he owned no life insurance policies or cars. The form instructed the defendant to list any assets he had transferred for less than their fair value in the last ten years. The defendant disclosed only the transfer of the 2010 Mercedes. During the interview, the defendant told the Revenue Officer that he did not have any personal expenses and that Individual 2 handled all their living expenses except the defendant's alimony payments.

kk.     After the February 18, 2020 interview, the Revenue Officer sent the defendant a form requiring the defendant to produce records, including bank and credit card statements, cancelled checks, and wage slips of Gryphon Partners. In response, the defendant sent a letter dated March 23, 2020 to the Revenue Officer at his office in West Palm Beach, Florida. The defendant did not provide any of the requested financial records of Gryphon Partners. In his letter,

14

he wrote that "I have no ownership interest in Gryphon Partners, Inc.; therefore, I have no control over its" bank or credit card statements or canceled checks. He added that Gryphon Partners "does not issue wage slips to me, its employee."

11. On February 19, 2021, an accountant representing the defendant faxed the Revenue Officer another Form 433-A, signed by the defendant. For the most part, the form repeated the allegations the defendant had made on the form he submitted the previous year. However, on the new form, the defendant reported zero income.

10. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

Date: 2/7/2025        By: *Marc Osborne*
MARC OSBORNE
ASSISTANT UNITED STATES ATTORNEY

Date: 2/19/21        *Michael J. Rosen*
MICHAEL J. ROSEN
ATTORNEY FOR DEFENDANT

Date: 2.19.2025        *Eston Eurel Melton III*
ESTON EUREL MELTON III
DEFENDANT

15