UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CR-80001-Rosenberg/Reinhart

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ESTON EUREL MELTON, III,

        Defendant.

_____

### ESTON MELTON, III'S SENTENCING MEMORANDUM; REQUEST FOR DOWNWARD VARIANCE; AND SUPPLEMENT TO DEFENDANT'S PREVIOUSLY FILED OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

The Defendant, ESTON MELTON, III ("Dusty"), by and through undersigned counsel, pursuant to Fed. R. Crim. P. 32, and 18 U.S.C. § 3553(a), respectfully files this Sentencing Memorandum, which includes a supplement to the Defendant's previously filed objections to the Presentence Investigation Report (DE 21), and **request for a downward variance** from the Sentencing Guidelines.

### INTRODUCTION

This is a very different tax evasion case – where every dollar of income and tax obligation was reported in full, including the years at issue, 2005-2014. In the years before 2005 and for every year following 2014, all income has been declared and all taxes paid in full. From 2015 through 2023, Dusty and Mabel have paid **$1,240,688.00** in taxes.:

        2015 - $82,055        2019 - $200,348
        2016 - $75,199        2020 – $82,613
        2017 - $88,273        2021 – $54,762

| 2018 - $535,093[1] | 2022 - $17,414 |
| 2018 - $66,405 | 2023 - $38,526 |

The obvious question is: What happened during this 10-year period and what is the appropriate punishment? Keeping in mind the criminal charge of willfulness within Section 7201, the answer lies in the life events before, during and after this ten year period.

To be clear, the crime in this case was the willful decision to not pay taxes. Dusty has admitted to and fully accepts responsibility for his conduct. It is the events surrounding the non-payment of taxes, however, that take this case out of the ordinary tax evasion case. It is also the reason behind the very legitimate request for a downward variance authorized by 18 U.S.C. § 3553(a).

As noted in the Presentence Investigative Report (PIR), Page 5 (7), *prior to this criminal investigation,* Dusty paid a total $599,331 of the $1,313,840 taxes owed for 2005-2014, almost half of the taxes he owed for the years at issue.

At the conclusion of this memorandum, it is anticipated that the Court will understand that the Government's myopic perspective is skewed (obviously to Dusty's peril) and the true scope of Dusty's conduct, viewed with full and balanced vision, provide legitimate and lawful grounds to vary downward from the Sentencing Guideline table.

## THE DUSTY AND MABEL STORY

Dusty moved to Miami in 1979, hired as a reporter for The Miami Herald, covering county government and politics, becoming a highly respected journalist. Dusty had three children in Miami during his first marriage, which ended in 1996.

---

[1] From sale of Dusty's Miami home on Poinciana.

Mabel, age 3, and her family immigrated to Miami from Cuba in 1967. She went to work for Miami-Dade County government at age 17, right out of high school, first in the Office of the County Clerk, then <u>chief of staff</u> for two county commissioners, followed by senior assistant to the Port of Miami director. Dusty, 28, and Mabel, 18, met at County Hall in August 1982. Over the ensuing years, they became best friends.

In October 1982, Dusty left the Miami Herald to join National Projects, the only non-lawyer lobbying firm in Greater Miami, with a practice concentrated in county zoning and contracting. Dusty was the "front man", the outside partner of this two-person lobbyist business, attending client and government meetings while his partner worked from home. This was the successful business model he knew.

Dusty formed Global Projects in 1995 immediately following the death of his partner. By prior agreement, Dusty paid his partner's estate, over time, the fully agreed price of $347,970 to acquire National Projects' book of business. Dusty's new clients hired Global Projects.

Dusty and his first wife reached a divorce settlement in 1996, following which she and their three young children immediately moved to Tallahassee. Dusty and Mabel married six months later.  Thereafter, Mabel, her daughter (8) and son (12) moved into Dusty's former marital home in Coconut Grove (3430 Poinciana).

From the very outset of their marriage, Mabel was a daily active contributor and equal partner with Dusty (with compatible responsibilities) in the family lobbying practice. Mabel was and is as much a political animal as Dusty. Their county government business increased due to Mabel's Hispanic background, culturally and linguistically. Each and every day, Mabel and Dusty discussed and analyzed immediate client matters and needs,

explored and decided long-term client strategies. Mabel also oversaw Global's billing from their home. As with National Projects, there was no outside Global office.

In their 13 years together at National Projects, Dusty's partner/owner never attended a government or client meeting. Dusty was the "outside guy" attending all of the meetings. It was this business model that Dusty and Mabel followed, an inherent blend of their marriage and business relationship. Mabel has been Dusty's "inside partner" for 28 years, since the day they married. Although not frequently, Mabel has attended client meetings dating back as early as weeks after their marriage and has done so over the years when her language skills and personal relationships were value added. Most of their practice was at Miami-Dade County and City of Miami governments and Miami-Dade County Public Schools.

Dusty and Mabel were filing individual tax returns when they married, and that practice continued out of habit until it was recommended that they file joint returns, which they did starting for the year 2018, and continuing to this day. Dusty drew a salary; Mabel did not.

Early in their marriage, and in furtherance of their family lobbying business, Mabel was a direct outside consultant to the Miami chapter of the American Red Cross and then the South Florida Chapter of the National Multiple Sclerosis Society, lobbying on their behalf at Miami-Dade County and the City of Coral Gables for grant funding. Mabel registered as a County lobbyist in February 2003, 22 years ago.

## FAMILY FIRST

The Government asserts that Dusty willfully created nefarious schemes to "evade" paying his taxes. The impact of Dusty's conduct affected the IRS's collections ability of

which Dusty was aware and to which he has admitted. However, from the sale of his Coconut Grove home to the establishment of Mabel's business, there were family – not IRS – reasons, legitimate "family first" reasons, that explain and mitigate Dusty's conduct. The willful decision was placing Dusty's familial responsibilities ahead of his responsibility as a taxpayer. For this, Dusty has pled guilty. It is the perspective of the proper punishment that is presented herein.

It is correct to say that Dusty chose to be a responsible husband, father and stepfather first and a taxpayer second. Dusty chose to first take care of his children's (biological and step) education, legal needs and court obligations to his former wife.

Critically, the Court will not find fancy vacations, second homes, expensive cars or jewelry. The Court will also not find a retirement account. What the Court will find is a lot of debt because of life's necessities.

The reason Dusty did not pay his taxes for those 10 years was the "Hobson's choice": Dusty could either discharge his responsibilities to his family, as a husband, father and stepfather or he could pay the IRS. Dusty chose family first. This was a moral choice yet a legally wrong choice, for which Dusty has now pled guilty to tax evasion.

From 1996 through 2018, in addition to purchasing the ongoing lobbying business from National Projects for **$347,970**, Dusty has paid:

    **$909,318** in court-ordered alimony.

    **$258,60**0 in court-ordered child support for his three biological children.

    **$52,770** in court-ordered child life insurance policies.

    **$13,201** in court-ordered child medical expenses.

> **$480,000** (estimate) on tuition, food, travel and almost all other expenses for his three biological children to attend four years of college (all out of state), plus significant expenses for two of his children to attend two-year graduate schools, both out of state.
>
> **$150,000** (estimate) on tuition and all other expenses for his adopted son to attend a four-year college and two-year graduate school, in-state, and one year of law school, out of state.
>
> **$270,578** to defend his adopted son in Miami federal court and to visit him following his conviction, at Federal Prison Camp, Montgomery, Alabama.
>
> Total "family first" costs: almost **$2.5 million**.

In addition, Dusty paid the home mortgage principal, interest, insurance, real estate taxes, food, utilities and life insurance premiums plus <u>annual</u> interest payments totaling $48,360 on more than $1.2 million in life insurance policy loans, taken across the years to pay family expenses.

None of this is offered as an excuse; rather, Dusty's life realities.

### THE HOME ON POINCIANA

At his initial meeting with the IRS in January 2012, Revenue Officer Yanes demanded that Dusty sell his Coconut Grove home (which he alone owned) to reduce his accumulating tax debt. Reflecting Dusty's personal financial struggles, Dusty was in mortgage payment arrears, over time, with 13 lis pendens placed by his mortgage company on his home in Coconut Grove. (See Exhibit "A").

Officer Yanes started their meeting by asserting that Zillow calculated the home's value at $2.2 million, which amount is reflected in the Revenue Officer's notes, (Bates

label 42.  See Exhibit "B").  The house was placed on the market shortly thereafter.  Ultimately, the house sold for $1,358,000.  From those funds, Dusty's alimony arrearage was brought current and the IRS received $535,093 toward Dusty's 2005 and 2006 tax obligations.  Dusty received nothing.

Dusty's first listing was around 10% higher than the IRS and Zillow showed - $2.425 million.  The Government's obsession with the real estate agent and his real estate price is irrelevant.  Every homeowner wants to maximize their sale price of their largest asset and every agent wants the fastest sale possible.  Happens every day.  Dusty thought the marketplace would value his home's particular Grove location higher, and set a hopeful asking price of $2.425 million – only 10% higher than Ms. Yanes.  The realtor wanted as quick and easy a sale as possible and insisted on a listing price of $1.75 million – 20% lower than Ms. Yanes and 28% lower than Dusty.

A compromise was reached:  The realtor would prepare a listing agreement without many of the "normal" public promotional elements of marketing a property. The listing agreement included a mechanical text strike-through of certain marketing items. This was not an effort by Dusty to obstruct the sale of his home; to the exact contrary, it was an effort by Dusty to obtain the highest possible sales price for the benefit of himself and the IRS.  As Page 6 (13) of the PIR reflects, over time, Dusty agreed repeatedly to reduce the asking price (and changed realtors twice) in order to effect a sale via the seventh contract, in 2018.  Several contracts fell through unrelated to Dusty, including inspection issues.

One of those failed contracts (with Individuals 4 and 5) is described at Page 7 (21) of the PIR. Dusty never dealt directly with the IRS regarding its approval for the sale of his home.  Dusty's tax accountant was unable to timely secure IRS approval for this

contract. Dusty declined to extend that contract because Dusty had just learned of the IRS's Offer in Compromise (OiC) program. Dusty hired counsel, but his OiC effort ultimately was not successful.

## GLOBAL AND GRYPHON

The PIR asserts at Page 7 (22) that Dusty "provided most or all of these services" of Global Projects. Correctly stated, Dusty provided virtually all of the "***external***" or "***outside***" services of the firm, which was the family lobbying practice in which Mabel was the completely equal, "inside" partner. Mabel was also the insider who handled client invoices and billings.

The alleged income shifting (to evade Dusty's payment of taxes) has a different reality. Dusty owned Global, in which his wife, Mabel, participated, as a family unit. As is evident, Dusty was always struggling financially. It is not that he was not earning a good income, but the weight of the debt – alimony, child support, college educations and expenses, legal fees – was an overwhelming constant.

Life's economic pressures became too much. Dusty declared Chapter 7 bankruptcy in early 2017.

Two factors led to the formation of Gryphon, neither of which concerned the IRS. The first was Dusty's stepson, Mario's arrest, trial, conviction and sentence. Of all the five children, Mario was clearly closest to both Dusty, and especially Mabel. Mario's conviction was deeply troubling to the family and expensive. Dusty and Mabel, at least monthly, traveled to the federal prison camp in Montgomery, Alabama to meet with Mario.

Dusty was in serious alimony arrears with his ex-wife, due to his lifetime alimony obligation of $5,000, per month. Emails were sent by her threatening to either take Dusty

back to court or to file a lawsuit to garnish Dusty's income and assets (Global).[2] (See Exhibit "C", by way of example). Emails from Dusty's former wife continued throughout 2019.

The combination of Mario's situation, the weekend visits, the expenses, the increasing threats by Dusty's former wife and his growing arrearages, led to an emotional meltdown by Mabel on March 11, 2017. Mabel had reached the breaking point for her own well-being and security, and their marriage was in jeopardy. Fearing the former wife's successful reach into whatever family assets were left (Global) is what led to the formation of Mabel's company, Gryphon.[3]

The Government asserts that Gryphon Partners was set up to defeat Dusty's tax collection ability; it was not. It was set up in 2017 to secure Dusty's wife (and their marriage) a guaranteed source of income and to protect Mabel's financial future from an asset-grab lawsuit against Dusty.

How was Gryphon run? Mabel was a political animal, a female Hispanic with historic contacts at Miami-Dade County. Mabel registered as a lobbyist in 2003, and re-registered in 2020. Remembering that Dusty and Mabel acted as a team since their marriage in 1997, Mabel needed to drive the revenue from the clients of Global, hence the migration of clients from Global to her new company, Gryphon. Mabel became more active, but Dusty was still the known "outside" commodity. Dusty still attended the

---

[2] "If you fail to respond, I will be forced to pursue a course of action that, I believe, neither of us would desire. Aug, 2015.

[3] A gryphon is a Greek mythological creature: half eagle and half lion. It was the symbol associated with the law firm of Milton Ferrell, who had hired Mario as an office intern. The Court has met his widow, Lori, on the sentencing video, who is associated with the Miami Art Museum.

government meetings, but he became a salaried employee of Gryphon, ultimately closing Global.  Yes, this affected Dusty's financial status which impacted the IRS's collection ability.  This is acknowledged, but life does not function in singular events, rather a confluence of daily life events.

The Court must recall that from 2015 forward, all taxes were declared and paid. Gryphon was not formed until 2017 (when Mario was still serving his sentence – and the former wife's threats were becoming more serious).

While it is conceded that the migration moved income from Dusty to Mabel, the reasons behind it are far more than the Government's singular perspective.

**WEST PALM BEACH HOME**

There was an additional reason for Mabel to form Gryphon Partners.  Because Dusty could not qualify for a new credit card much less a residential mortgage or rental agreement due to his February 2017 bankruptcy, only Mabel could obtain a new home following the sale of Dusty's Coconut Grove home in April 2018.  It was both a necessity and a practicality that Mabel begin receiving the overwhelming portion of income from the family lobbying practice beginning in 2018, in order to boost her creditworthiness to secure their new residence.  The migration of clients to Mabel's company, Gryphon Partners, and Mabel's receipt of the overwhelming portion of family-practice income, is accurately reflected at Pages 8 and 9 (32, 33, 34) of the PIR. The implication, at Page 10 (43) of the PIR, that the migration of clients to Gryphon Partners from Global Projects was caused by a renewed contact of Dusty by an IRS revenue officer, is mistaken. While the timing is thus, the criminal intent was not.  This was a life/family/business decision.

In November 2018, Mabel purchased her home in West Palm Beach with her own funds that she earned from Global Projects, Gryphon Partners and a number of real estate transactions she had managed since obtaining her license in 2015.[4] Mabel received an interest only loan from Benworth Capital Partners, whose principal Mabel had known for many years. Mabel was able to pay off this loan in 2019 and put a down payment on her home in West Palm Beach. This was the result of a commercial real estate transaction for which Mabel was the broker. In other words, the purchase of Mabel's West Palm Beach home was entirely the result of Mabel's own connections and hard work.

## OTHER ALLEGATIONS

It is undisputed, as the PIR asserts at Page 7 (24), that Dusty took compensation from Global Projects via checks payable to him, cashed those checks, and deposited those funds into Mabel's personal checking account: 67 checks totaling $81,906 across 42 months (3/8/2016 to 9/10/2019). That's an average check amount of $1,222. It was entirely normative for Dusty to help Mabel, his wife, timely pay her personal bills: that is what spouses do for one another. Once Mabel began drawing a salary from the family lobbying practice, such insignificant financial support ceased. This was not a scheme in furtherance of Dusty's evasion of paying his overdue taxes.

On March 7, 2017, when Dusty described Global Projects to an attorney with the Office of the U.S. Trustee as "between my ears" at Page 7 of the PIR (26), Dusty was the only salaried Global Projects employee.

---

[4] To supplement the family's struggling income, Mabel obtained a real estate license. This business venture has not proven very successful.

Four New York Life Insurance policies named Dusty as the insured. The total face value is $2.25 million with annual premiums totaling $31,593.  Over time, in order to pay "family first" expenses, Dusty has borrowed a total of $1.2 million against the cash value of the policies. Annual interest payments on those policy loans, today, is $48,360.

Dusty transferred ownership of those four policies in February 2020 within days of his heart catheterization at Baptist Hospital in Miami, a procedure with potentially serious medical consequences, including stroke or death; two coronary stents were implanted. The ownership transfer of the four enormously debt-burdened policies was entirely intended to simplify Mabel's life if Dusty were to die from his medical procedure: The implication, at Page 10 of the PIR (45), that the change in life-insurance policy ownership was in any way caused by a renewed contact of Dusty by an IRS revenue officer is mistaken.

Also within days of Dusty's heart catheterization, he transferred to Mabel title to two well-used family cars. At Page 11 (46) of the PIR, the estimated value of the cars three years prior to title transfer was under $25,000, a truly nominal amount.  The vehicle ownership transfer was entirely intended to simplify Mabel's life if Dusty were to die from his medical procedure: The implication that the transfer was in any way caused by a renewed contact of Dusty by an IRS revenue officer is mistaken.

## OBJECTONS TO PARAGRAPHS 99 AND 102 OF THE PSR

This falls under the Probation Report's category of Dusty's financial ability to pay a fine.  In paragraphs 99 and 102, the probation office lists Mabel's home as an asset of Dusty, the cars as assets of Dusty, and Mabel's income as Dusty's.  The Government supports this, referencing certain allegations in the Information and Plea Agreement.

Perhaps here, reality and practicality combine; neither party seems inclined to back off of its own view of the issues underlying this case. Did Mrs. Melton purchase the house on her own merit – yes. The closest the Government comes to really challenging this is that some of the funds came from Global. Similarly, attributing all of Mrs. Melton's income from Gryphon as an asset of Dusty likewise gets into the factual heart of this case.

It is safe to say that neither party nor likely the Court desire to turn this sentencing into a mini trial in light of the resolution of this matter by plea.

Even on its face, a fine seems difficult if not impossible to pay, particularly where there is such a significant tax obligation on Mr. Melton.

It is respectfully requested that the Court find no ability to pay without addressing all of the contested facts, particularly in light of the obvious outstanding civil tax obligation.

## SOPHISTICATED MEANS

"Sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2T1.1, comment. (n. 5). Common day usage of each word and the use of common sense clearly rebut the application of "sophisticated means". Returning to the Government's myopic perspective, viewing every life decision as an effort to hide each act from the IRS, defies reality. The crime in this case, the willful failure to pay was that - a willful decision. The reasons behind every act to which the Government attributes bad motive and sophisticated means is not there. The *Campbell* case relied on by the Government presents the perfect counter to their own argument, where the Defendant, Mayor of Atlanta, had <u>undocumented payments</u> (bribes) hidden, utilizing campaign accounts and credit cards issued to other people to conceal cash expenditures in "a deliberate attempt

to impede the discovery of both the existence and extent of the tax fraud. *U.S. v. Campbell*, 491 F.3d 1306, 1322-1323 (11th Cir. 2007).

Here, every penny of Dusty's income was reported. There was nothing unreported on Dusty's or Mabel's tax returns, unlike *Campbell*. Nothing was hidden. Every asset was open and available to the Government. The declaration of all income, alone, distinguishes Dusty's conduct from *Campbell*.

By way of example, the allegations concerning Gryphon and Global, and the house sale and purchase, were done openly and in the simplistic manner. Husband sells old house; wife buys new house. The Court now knows the underlying details behind these acts – neither hidden, intricate, nor complex. The transfer of a modest amount of money over a period of months, in light of the millions of dollars due in taxes over multiple years, does not rise to the level of especially complex or especially intricate activity, nor was it done by subterfuge. Dusty acknowledged to the IRS depositing funds into Mario's account, was told to stop and he did. Finally, the allegation at Paragraph 8 in the PIR that Dusty Melton asked Ron Book to pay other people is not true.[5]

All income was declared. Whether it is from the Government's perspective or that of Dusty, at its core, there was simply nothing complex or intricate in the acts underlying the failure to pay. "Sophisticated Means" mandates proof that conduct at issue not only be complex or intricate, which is was not, it also adds a layer of **especially** complex or **especially** intricate. The life activities inside the Melton home do not support a "sophisticated means" enhancement.

---

[5] See Exhibit "D".

The combination of these activities do not support a two level guideline increase. By comparison, see *U.S. v. Truss*, 723 Fed. Appx. 660, 666 (11th Cir. 2018) (recruiting 37 individuals to file 50 separate, fraudulent claims for payment involving false W-2 forms, payroll stubs and lay-off notices).

The two level increase for sophisticated means is legally inapplicable to the conduct of Dusty Melton.

## RESTITUTION

Defendant has raised an objection to the amount of restitution. (DE 21). In this regard, penalties imposed by the IRS are inappropriate to include in a restitution order. *U.S. v. Perry,* 714 F.3d 570, 577 (8th Cir. 2013).

That said, and perhaps swimming up stream, it appears unclear that the law supports restitution at all under Title 26. The cases seem to support the use of 18 U.S.C. § 3583(d), condition of supervised release, to support restitution of a tax offense. The proverbial "fly in the ointment" is that § 3583 specifically mandates restitution "in accordance with sections 3663 and 3663A" (or any other statute authorizing restitution).

First, there is no other such statute, and restitution is a creation limited by statute. *U.S. v. Geddes*, 71 F. 4th 1206, 1211-1212 (10th Cir. 2023). Second, § 3663 is specifically directed toward Title 18 and 21 offenses. Finally, § 3663A is likewise inapplicable to Title 26 cases as recognized by the Government. (DE 28).

A timely objection was not filed to the imposition of restitution, but an illegal sentence cannot be waived or agreed to. *Baker v. Barbo*, 177 F. 3d 149, 155 (3rd Cir.), *cert. denied*, 528 U.S. 911 (1999); *Smith v. U.S.*, 321 F.2d 954 (9th Cir. 1963); *U.S. v. Cobb*, 967 F.2d 1555 (11th Cir. 1992).

Accordingly, Defendant asserts an objection to the imposition of restitution for his conviction under 26 U.S.C. § 7201 and further objects to the inclusion of a tax penalty should restitution be imposed.

Lastly, all of this can be avoided as the IRS already has full enforcement authority to seek and obtain any appropriate tax obligation.

## DUSTY MELTON'S HISTORY AND CHARACTER

### Medical

Under seal, Dusty Melton will be providing this Court with medical information that we request the Court take into consideration in fashioning the sentence in this case.

### Title 18 U.S.C. § 3553(a)

This Court is fully aware of the construct of § 3553(a); it need not be repeated. The weighing of offense conduct and personal history and characteristics of each defendant is the driving dynamic behind every individual sentence.

As stated at the inception, this case is different. Much time has been devoted to the allegations in this case: it is now time to speak about the person.

A Sentencing Video has been filed manually with the Clerk of Court, along with a Notice of Filing Character Letters (DE 41) via CM/ECF, in support of Mr. Melton's Sentencing Memorandum.

In lieu of calling these witnesses at the sentencing hearing, the video and letters set forth the strength and integrity of Dusty's character. Each of these people has known Dusty for years and all express tremendous respect and admiration for Dusty. Many, of course, have also expressed shock, though were unaware of the financial pressures in Dusty's life. These submissions speak for themselves. Without repeating the many

stories shared in the video and letters, it is not an overstatement to say that it is unlikely that this Court has had a defendant, and most likely many of their counsel as well, that have presented greater strength of character and integrity of the soul than Dusty Melton.

**PRO BONO**

The following are snapshots of Dusty's extraordinary pro bono community service.

<u>Miami Art Museum</u>: In the early 2000's, Dusty attended the art museum's trustee meetings, and was singularly responsible for planning and implementing the strategy for securing a land lease from the City of Miami and funding from Miami-Dade County. (Mabel contributed significantly in September and October 2001, when the City of Miami unexpectedly scheduled a general obligation bond referendum for that November, which included $10 million to rebuild the park's seawall and $2.5 million in planning grants for two Miami museums: Miami Art Museum and Miami Science Museum. For two months, Mabel took trustees and staff to Hispanic radio stations, urging listeners to vote to raise the tax bills on their homes. The referendum passed.) Dusty led the negotiations with City officials over the amount of park land each museum would be given and the terms of their leases: each museum got all that it wished. In July 2002, Miami commissioners gave each museum four acres in the park, now known as Maurice A. Ferre Park. (A parcel of land on the nearby Miami River near the bay sold in 2014 for $100 million per acre, making the art museums' gifted land worth then about $400 million.) Dusty later engineered a $100 million grant for construction of its new building.

<u>Farm Share</u>: Farm Share distributes some 35 million pounds of food, free of charge, to certifiably poor residents throughout Miami-Dade County. In Summer 2009, as the County was preparing its budget for the fiscal year beginning that October 1, dire

economic conditions caused officials to propose cutting the annual subsidy for hundreds of art and cultural organizations, as well as all community-based not-for-profit organizations such as Farm Share, by 30%. Dusty devised a strategy to convince County commissioners that Farm Share would go out of business unless its subsidy was *increased* to $600,000. Dusty and Mabel lobbied County administrators and commissioners, who voted 13-0 to cut all of the arts/cultural/community-based groups' funding by 30% . . . and to increase Farm Share's funding to $600,000. Dusty and Mabel since have helped grow that funding to beyond $700,000 annually.

<u>Miami Children's Museum</u>: Also in Summer 2009, Mabel and Dusty were introduced to museum CEO Debbie Spiegelman by Board Chairman Jeffrey Berkowitz. The museum was desperate to obtain significant financial support because Bernie Madoff's Ponzi scheme had stolen tens millions of dollars from some of the museum's major benefactors, who could no longer meet their museum-donation commitments. The Children's Museum never has received one penny in County subsidy. After lobbying by Dusty and Mabel, the Commission approved a yearly grant of $750,000.00 in annual subsidy for the Children's Museum, which continues to this day.

Dusty Melton has put millions of dollars into South Florida charities and museums, worked for the DFYIT Program (aimed at keeping teens away from drugs), the Shake-A-Leg sailing program for handicapped children, Girl and Boy Scouts in South Florida, Special Olympics, His House Children's Home (for unaccompanied foreign minors fleeing violence at home), the list goes on, for NOT ONE PENNY – for years.

The recipients of these endless and successful endeavors, as the Court has heard on the video and seen in the letters, figure that Dusty's service on a fee paying basis would have been one million dollars, or more, throughout 2005-2014. Yet Dusty, knowing the extent of his own personal needs, refused every offer of compensation.

That is a true servant of the public.

## CONCLUSION

Where is the balance for all of this? Had Dusty requested payment, for which he so rightly deserved, there may never have been any tax issue whatsoever. Instead, he gave of himself – time and money, for the greater good. And has done so for a lifetime. Might the fall from grace, a felony conviction and home confinement with community service balance every aspect 18 U.S.C. § 3553(a)?

> *"… surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.* The elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant." (emphasis added)

*U.S. v. Adelson,* 441 F. Supp. 2nd 506, 511 (S.D.N.Y. 2006). (Rakoff, J.)

WHEREFORE, for the above and foregoing reasons, Defendant, Eston ("Dusty") Melton, respectfully requests this Honorable Court deny the sophisticated means enhancement and grant him a downward variance to a punishment of home confinement with significant time for community service to be developed in conjunction with the probation office.

Dated this 5th day of June, 2025.

Case No. 25-CR-80001-Rosenberg/Reinhart
Melton's Sentencing Memorandum

Respectfully submitted,

MICHAEL J. ROSEN, P.A.
*Counsel for Defendant*
100 SE 2nd Street, Suite 3400
Miami, Florida  33131
Tel:  305.446.6116
Fax:  305.448.1782
Email:  mjr@mjrosenlaw.com


__*s/Michael J. Rosen*_____
Michael J. Rosen, Esq.
Fla. Bar No. 183719

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court via CM/ECF which will electronically serve AUSA Marc Osborne, United States Attorney's Office, 500 South Australian Avenue, Suite 400, West Palm Beach, Florida, 33401, marc.osborne@usdoj.gov, this 5th day of June, 2025.


___*s/Michael J. Rosen*_____
Michael J. Rosen