UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-80001-Rosenberg

UNITED STATES OF AMERICA

v.

ESTON EUREL MELTON III,

    Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The United States respectfully responds to defendant Eston Eurel Melton III's sentencing memorandum (D.E. 43).

**Facts**

For tax years 2005 through 2014, Melton filed personal federal income tax returns acknowledging a cumulative tax due of $1,313,840. D.E. 27 ¶ 7. In total, Melton has paid $62,100 towards those taxes. The IRS collected an additional $537,231 through liens and levies. D.E. 17 ¶ 9(a); D.E. 27 ¶¶ 7, 27.

Beginning in 2008, revenue officers placed liens on Melton's Coconut Grove residence. On May 9, 2011 and January 10, 2012, Revenue Officer Frances Yanes warned Melton that, if he did not sell the house, the IRS might levy (seize) it. D.E. 27 ¶ 10. On May 4, 2012, Melton informed Yanes that he had hired a realtor to sell the house. D.E. 27 ¶ 11. Melton' realtor recommended an asking price of $1,750,000, but Melton's asking price was $2,425,000. In the listing agreement, which Melton signed on May 31, 2012, he specified that, until October 31, 2012, the realtor could not list the property in MLS, advertise the property, put up "for sale" signs, or provide information about it to other real estate agents.

Melton also declined to make the property available for showings and inspections. D.E. 27 ¶ 12.

By the end of 2014, Melton had not sold his house. The government moved to levy the house on January 21, 2015. Melton entered a contract to sell the house on February 20, 2015. D.E. 27 ¶¶ 15–16. Within days of entering the contract, Melton urged the government not to proceed with the motion to levy, arguing that it would interfere with the sale. Although the government obtained an order authorizing the levy, the government told Melton that we would not execute the order if Melton sold it himself. D.E. 27 ¶ 17. Beginning with the contract of February 2015 and continuing through May 2016, Melton entered five contracts to sell his house, all of which fell through. D.E. 27 ¶ 19.

Because of the IRS liens, Melton needed a conditional discharge from IRS to sell the property pursuant to any contract he entered. Melton's sales contracts included deadlines for Melton to obtain this approval. Melton did not obtain the necessary approval in time to satisfy the fifth contract. The buyers offered to extend the deadline, but Melton declined, allowing the contract to expire instead. D.E. 27 ¶ 21. On August 22, 2016, after the contract had expired, Melton's accountant informed him that the IRS had approved sale of the house pursuant to the contract. GX 3 at 26811–12. Melton responded that he was considering his next steps and might "request [that IRS] return my file to storage, awaiting the next, new sales contract." GX 3 at 26813.

On December 1, 2016, Melton made an offer in compromise to the IRS, pursuant to which he would have paid $750,000 in five installments to fully settle his tax debt. GX 1 at 189–90. The IRS will consider an offer in compromise only if the taxpayer pays a first

installment of at least 20% of his or her tax debt at the time he or she makes the offer. *See generally* IRS, *Offer in compromise*, https://www.irs.gov/payments/offer-in-compromise (May 22, 2025). On or before February 14, 2017, Melton's representative told the IRS that Melton would not be able to pay the first installment. GX 1 at 196. As a result, IRS did not consider Melton's offer.

On February 12, 2017, Melton filed for Chapter 11 bankruptcy, causing IRS to suspend its efforts to collect his tax debt. D.E. 27 ¶ 25. Melton's lender had a $555,013 lien on the property, GX 4 at 61114; his ex-wife had a $122,036 lien, GX 4 at 61115; he owed his ex-wife another $561,000 in unpaid alimony, GX 4 at 61257–60; and by that point he owed the IRS $2,143,381, D.E. 27 ¶ 27. Early in the bankruptcy process, Melton was interviewed by an attorney with the Office of the U.S. Trustee. She asked Melton how he would be able to fund a payment plan for his creditors. Melton responded that he and his wife had "begun to retreat significantly from our customary expenses."[1] On April 16, 2018, Melton sold the Coconut Grove house for $1,358,000. After satisfaction of the mortagee's and Melton's ex-wife's liens, the IRS received $535,093.25. Melton got nothing from the sale. D.E. 27 ¶ 27.

Melton owned his own lobbying business, Global Projects, Inc. D.E. 27 ¶ 22. He provided "most or all" of Global Projects' services. D.E. 17 ¶ 9(m); D.E. 27 ¶ 22. Between March 8, 2016, and September 10, 2019, Melton signed checks made out to himself from Global Projects' checking account. The checks were negotiated for cash, after which the

---

[1] The interview has not been transcribed. Melton made this statement at approximately the 10:50 mark. The government will have the recording available at sentencing.

same or similar amounts of cash were deposited into Melton's wife's personal bank accounts. Melton made 67 such payments to his wife, for a total of $81,906. D.E. 27 ¶ 24.

Gryphon Partners, Inc., also a lobbying company, was incorporated on March 15, 2017. According to its tax filings, Mrs. Melton's was the sole owner. D.E. 27 ¶ 30. From 2017 through 2019, Global Projects' revenue rose, but Gryphon Partners' rose faster. D.E. 27 ¶ 32. Many of Gryphon Partners' clients were previous clients of Global Projects. D.E. 27 ¶ 33. Melton provided "most" of Gryphon Partners' services. D.E. 17 ¶ 9(v); D.E. 27 ¶ 31. Global Projects reduced its distributions to Melton while making payments to his wife, and Gryphon Partners made payments to Mrs. Melton without paying Mr. Melton. By 2018, Mrs. Melton was receiving 71% of the distributions to the Meltons from Global Projects and Gryphon Partners combined. In 2016, Mr. Melton had received 100% of those distributions. D.E. 17 ¶ 9(y); D.E. 27 ¶ 34.[2]

On November 27, 2018, Mrs. Melton bought a house in West Palm Beach for $682,500, taking title solely in her name. D.E. 27 ¶ 35, 101. Of the $175,050 cash to close, 67% was proceeds of Global Projects and Gryphon Partners. D.E. 27 ¶ 38. During the preparations for the sale, Mr. Melton directed his wife to tell the title agent that Mr. Melton's name would not be on the deed because "I [Mrs. Melton] am purchasing [the West Palm Beach house] with my own funds and in my name only." He directed her to add that, "[i]f you would like Dusty to sign the mortgage and/or promissory note alongside me, that would be fine. But Dusty will not be on title." D.E. 27 ¶ 36.

---

[2] The payments from Global Projects to Mrs. Melton include the cash transfers described above.

As of July 23, 2019, Melton still owed the IRS $1,780,423. That day, Revenue Officer Adriel Castro informed Melton that the IRS still intended to collect the debt. D.E. 27 ¶ 40. Thirteen days later, on August 5, 2019, Melton sent letters to at least three clients of Global Projects. Each letter stated that

> responsibility for and supervision of my existing consulting services for you . . . will be assumed by Mabel's Gryphon Partners, of which she is president and I am Chairman. I will continue to be your primary political asset and point of communication, but Mabel's company will become your client relationship.

D.E. 27 ¶ 41. Within a few months, Global Projects' revenues dropped dramatically while Gryphon Partners' rose. D.E. 27 ¶ 43.

On February 4, 2020, Castro left a summons for Melton requiring him to attend an interview on February 18, 2020. D.E. 27 ¶ 44. A week later, Melton transferred title to his cars—which had been worth $24,400 in 2017—and life insurance policies—with a combined cash value of $51,419—to his wife. D.E. 27 ¶¶ 45–46.

At the February 18 interview, Melton represented that he earned $3,000 per month at Gryphon Partners, that his wife paid all their expenses, and that he had no assets. Castro asked Melton to make full payments of his taxes and Melton responded, "Not going to happen." The revenue officer asked if Melton had a plan or intent to resolve the balances and Melton responded, "You tell me." D.E. 27 ¶ 47.

After the February 18 interview, Castro gave Melton a Form 9297, requiring that he produce Gryphon Partners' financial records. D.E. 27 ¶ 48; GX 5 at 25333. On March 4, 2020, in a discussion of this form with one of his accountants, Melton asked the accountant to "kindly ascertain, year by year by year, the exact date on which each of those annual [tax] debts goes 'poof.'" GX 6 at 40278. On March 23, 2020, Melton responded to Castro's

Form 9297 by letter. He did not provide any of the requested financial records of Gryphon Partners. Instead, he wrote, "I have no ownership interest in Gryphon Partners, Inc.; therefore, I have no control over its" financial records. GX 5 at 25331; D.E. 27 ¶ 48. Melton didn't mention his status as Gryphon Partners' Chairman, as he had done when writing to his clients. D.E. 47 ¶ 43.

On February 19, 2021, Melton sent Castro a form about his finances, reporting zero income. D.E. 27 ¶ 49.

**Memorandum**

Melton requests a sentence of home confinement. Such a sentence could not in any way account for the seriousness of Melton's offense conduct. A sentence of 30 months' incarceration, at the low end of the Guidelines' incarceration range, is the minimum consistent with the serious nature of the crime; Melton's history and characteristics, including his failure to fully acknowledge his culpability; the need for deterrence, and the Guidelines incarceration range.

Melton's sentence must "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense[.]" 18 U.S.C. § 3553(2)(A). Melton's offense was very serious, more serious than routine tax cases. For almost twenty years, , from at least 2012 through at least 2021, Melton repeatedly misled Revenue Officers, delayed their enforcement efforts, and hid his assets from them, all to evade payment of any part of his enormous tax debt, which grew at one point to more than $2 million. In his memorandum, Melton denies committing this crime, despite having pled guilty to it. He criticizes the government for "assert[ing]" that he "created nefarious schemes to 'evade'

paying his taxes" whereas, according to Melton, "the crime in this case was the willful decision to not pay taxes." D.E. 43 at 4, 2. Melton is wrong. He was not charged with willful failure to pay taxes, in violation of 26 U.S.C. § 7203, but rather with tax evasion, in violation of 26 U.S.C. § 7201. Tax evasion consists of willfully taking "an affirmative act constituting an evasion or attempted evasion of" a tax deficiency. *United States v. Hesser*, 800 F.3d 1310, 1323 (11th Cir. 2015) (per curiam). And that is just what Melton did, many times over many years. Melton's arguments to the contrary are nonsensical and contradicted by the evidence. His sentence should reflect the serious, extended nature of his evasion as well as his efforts to deny and minimize his conduct.

Regarding his delays in selling his home, Melton argues that he initially priced the home only 10% higher than Revenue Officer Yanes's estimated value. D.E. 43 at 7. On January 10, 2012, Revenue Officer Yanes valued Melton's home at $2 million. GX 1 at 47.[3] So Melton's initial asking price was 20% higher than the revenue officer's valuation, and much higher than his realtor's recommended price of $1,750,000. D.E. 27 ¶ 12. It took Melton more than two years to reduce his asking price to the revenue officer's valuation and it took him almost three years to reduce it to his realtor's recommendation.[4] In the end, Melton spent six years purporting to try to sell the house, all while living in it and paying the taxpayers nothing. After those six years, he finally sold the house, for $1,358,000. D.E. 27 ¶ 27. Given Melton's extensive debts, described above at p. 4, it's doubtful whether Melton could ever

---

[3] In his memo, Melton relies (D.E. 43 at 6) on a note of Yanes's suggesting the house was worth $2.2 million. That note was made two months earlier, and there is no indication in the note that the valuation was communicated to Melton. D.E. 43-2.

[4] On March 26, 2014, Melton reduced his asking price to $1,990,000. GX 2 at 9. On March 23, 2015, he reduced it to $1,700,000. GX 2 at 9.

have received any of the proceeds of the sale, suggesting his true motive for keeping the price high: to delay the sale. And Melton's asking price is only one aspect of the evidence of his intent. No motivated seller would prohibit his real estate agent from listing a property in MLS, advertising the property, putting up "for sale" signs, providing information about the property to other real estate agents, showing the property, or allowing inspections. D.E. 27 ¶ 12. Nor would a motivated seller allow a contract to expire based on the seller's inability to get the IRS to approve the sale on time if the buyer offers to extend the deadline. Tellingly, when Melton's accountant told him that the IRS had approved the sale, Melton didn't suggest contacting the buyers to see if they were still be interested. Instead, he suggested "awaiting the next, new sales contract." GX 3 at 26813.[5] Melton wasn't really trying to sell his house at all; he intentionally delayed the sale so that he could continue to live in the property.

Melton also evaded taxes by transferring his clients to Gryphon Partners, a corporation owned, at least on paper, by his wife. Melton argues that this transfer did not constitute tax evasion either. First, he argues that his wife really worked at his lobbying businesses. Second, he argues that he transferred the business for reasons unrelated to his tax debt, namely, to avoid paying alimony and to boost his wife's credit score so that she could buy a house. Again, his contentions cannot be supported by the evidence.

---

[5] Melton contends that he allowed that contract to expire so that he could make an offer in compromise. D.E. 43 at 8. Melton did make an offer in compromise, four months after the contract expired. But it was not a serious offer; he couldn't even make the first installment payment. GX 1 at 189–90, 196. And he didn't mention the possibility of an offer to his accountant when the IRS approved the contract. GX 3 at 26813.

To begin with Mrs. Melton's role in Mr. Melton's lobbying, Melton conceded in the plea agreement that he provided ""most or all" of Global Projects' services and "most" of Gryphon Partners'. D.E. 17 ¶ 9(m) and (v). In his sentencing memorandum, things are different. "Correctly stated," he explains, he provided only the "'***external***' or '***outside***'" lobbying services. D.E. 43 at 8. In fact, "[f]rom the very outset of their marriage, Mabel was a daily active contributor and equal partner with Dusty . . . in the family lobbying practice." D.E. 43 at 3. But it is too late for Melton to "correct[]"—by which he appears to mean "disavow"—the statements he made under oath to this Court at his plea hearing, and his new contention is disproven by all the evidence in the case. From 2006 through 2016, Global Projects made significant payments to Melton, but none to his wife. GX 8.[6] In 2003, Mrs. Melton registered in Miami-Dade County as a lobbyist, but not on behalf of Global Projects, only the National Multiple Sclerosis Society. GX 9 at 61597–61610. The society was Mrs. Melton's only client until 2022. GX 9 at 61632. By contrast, Melton's own registration identified his firm as Global Projects. *E.g.*, GX 9 at 61295. And Mrs. Melton was not registered as a lobbyist at all from 2014 through 2019, when she supposedly founded Gryphon Partners. GX 9 at 61632, 61597–61610; D.E. 27 ¶ 31. In his bankruptcy petition of February 2017, Melton described himself as a "government lobbyist" working for Global Projects, with a monthly income of $12,470. He described his wife differently, as a "realtor" with no

---

[6] GX 8 includes all types of distributions reported on the returns, including profits, wages, commissions, and contractor ("1099") payments.
    A similar table is found at paragraph 9(y) of the plea agreement and paragraph 34 of the presentence report. However, that table is based on bank records. The government was able to obtain bank records only back to November 12, 2015. Therefore, we rely on the Meltons' tax returns here.

income. GX 4 at 61125–26. At his subsequent interview with the Office of the U.S. Trustee attorney, Melton said of Global Projects, "That's me. . . . That's between my ears." D.E. 27 ¶ 26. Although Melton was clearly talking about the duties "inside" the firm, he didn't mention his wife's supposed role. As late as July 2019, when the Meltons were interviewed by the Palm Beach Post, they described Mr. Melton as a lobbyist and Mrs. Melton as a realtor. GX 7. In short, there is no evidence to support Melton's naked assertion that his wife was active, much less an equal partner, in operating Mr. Melton's lobbying businesses. If the case had gone to trial, the government was prepared to call numerous clients of Melton's, at Global Projects and at Gryphon Partners, to testify that he provided all or almost all the lobbying for them. But there is no need for such testimony, because Melton admitted when he pled guilty that he provided "most or all" of Global Projects' services and "most" of Gryphon Partners'. The Court should not permit him to repudiate his sworn admission now. Global Projects' and Gryphon Partners' payments to Mrs. Melton were not compensation for lobbying work. Rather, Melton used the payments to create the false appearance that he had no assets or income.

Melton also argues that he transferred his income to Gryphon Partners for reasons unrelated to taxes: first, to prevent his ex-wife from obtaining his earnings and, second, to build up his wife's credit so that she could buy them a new house. D.E. 43 at 8–10. In the first place, "[i]f the tax-evasion motive plays any part in [the defendant's] conduct the offense may be made out even though the conduct may also serve other purposes . . . ." *Spies v. United States*, 317 U.S. 492, 499 (1943). Here, the evidence indicates that Melton's predominant motive, perhaps his only motive, was to evade the IRS.

In the first place, the government notes that Melton's assertion that he transferred income and assets to his wife to avoid paying alimony is in tension with his characterization of himself as a "family first" person. D.E. 43 at 5. But, leaving that aside, the question is not whether Melton's alimony obligations may have constituted a motive for his transfer of his business. Pursuant to *Spies*, the question is whether he transferred the business, and his other assets, at least in part to avoid paying taxes. As evidence that Melton's ex-wife intended to try to seize Global Projects, Melton has submitted an email in which she says that she would "pursue a course of action that . . . neither of us would desire." D.E. 43-3. But the IRS had been a lot more explicit than that with Melton, including the actual filing of a motion to levy his house. It is ridiculous to suppose that Melton transferred his assets to his wife to evade his alimony obligations, but gave no thought to his tax obligations.

Melton also suggests that he was trying "to boost [Mrs. Melton's] creditworthiness to secure their new residence." D.E. 43 at 10. In the first place, it is dishonest to lenders to pay a person for services not rendered or to overpay for the person's services for the purposes of improving his or her credit. But, again leaving that aside, a desire to improve Mrs. Melton's credit cannot explain Melton's actions. Such a desire might have been a good reason to pay Mrs. Melton a salary or to help her start a business. But Mr. Melton did far more than that. He turned over his entire business to her and paid her all the compensation, while continuing performing most of the labor, for free. And he continued to do that—indeed, he accelerated the process—in 2019 and 2020, after she had already bought the house. It defies common sense to suppose that Melton would completely divest himself of all his

income and assets solely to help his wife's credit score, supposedly with no concern for the IRS's collection efforts.

Melton argues that "from 2015 forward, all taxes were declared and paid[,]" whereas "Gryphon was not formed until 2017." In other words, Melton argues that the timing of his actions belies the contention that he transferred income to Gryphon to evade taxes. In the first place, Melton is wrong on the facts. Melton paid the *new* tax debts he accrued for tax year 2015 and later. But Melton still owed an enormous debt from earlier tax years, a debt that had grown to $2.2 million by February 2017. He made no effort to pay that debt, either in 2015 or through to the present day. In fact, far from exonerating Melton, the timing of his actions makes clear that he conducted his financial maneuvers for the purpose of avoiding collection of his tax debt. Two weeks after a revenue officer informed Melton of IRS's intent to continue collecting his tax debt, Melton directed Global Projects' clients to begin paying Gryphon Partners instead. D.E. 27 ¶ 40. Over the next few months, Global Projects' revenue essentially disappeared, and Gryphon Partners received all the compensation for Melton's services. D.E. 27 ¶ 43. Then, about a week after the revenue officer summonsed Mr. Melton for an interview, Melton transferred his cars and life insurance policies to his wife as well. Plainly, Melton transferred these assets at least in part to shield himself from the inquiries and collection efforts of the IRS.

Another method by which Melton evaded his taxes was to assist his wife to buy the West Palm Beach house solely in her name, making it more difficult for the IRS to obtain the value of the house as they had done before. Mr. Melton asserts that "the purchase of Mabel's West Palm Beach home was entirely the result of Mabel's own connections and

hard work." D.E. 43 at 11. Mr. Melton told his wife to tell her title agent the same thing. D.E. 27 ¶ 36. But that statement, whether made to a title agent or to this Court, is simply not true: Mrs. Melton paid $175,050 cash to close on the house, and two thirds of that money came from Global Projects and Gryphon Partners. D.E. 27 ¶ 38. Even if it were true that Mrs. Melton contributed to the operation of those companies—she did not—that fact would not obliterate Mr. Melton's own contribution. Yet, despite his financial contributions to the purchase, Mr. Melton wanted his name kept off the title. D.E. 27 ¶ 36. Nor could Mr. Melton's actions have had anything to do with his supposed concern over his poor credit. Mr. Melton specifically stated that he was willing to sign the mortgage; it was only the deed on which he did not want his name to appear. D.E. 27 ¶ 36. There is no explanation for that action except to hide his interest in the asset.

Melton also took other steps to evade the IRS. He had his business receipts deposited into his son's bank account. D.E. 27 ¶ 8.[7] He transferred over $80,000 to his wife by depositing in cash in her account. D.E. 27 ¶ 24. (Some of this money was used to buy the West Palm Beach house.) Melton suggests he was just helping his wife to pay bills, but he could have paid the bills himself, or written checks to her. Instead, he chose a method that would be undetectable without careful analysis of his and his wife's financial records. And

---

[7] In 2020, one of Melton's clients told an IRS revenue officer that, at Melton's request, the client paid for Melton's services by paying Melton's children. D.E. 27 ¶ 8. In support of his memorandum, Melton has submitted an affidavit in which the client states that he "has no recollection of Mr. Melton asking me to pay other people for his services, including his children." D.E. 43-4 ¶ 6. Neither Melton nor the client have denied that, in 2020, when his recollection was presumably fresher, the client admitted making such payments. However, the Court need not consider this discrepancy, because Melton admitted to a revenue officer that "his income was put in his son's account to evade IRS levies." D.E. 27 ¶ 8.

he closed his own bank accounts, conducting any additional transactions in cash. D.E. 27 at 39. These actions are also recognized methods of tax evasion. See *United States v. Conley*, 826 F.2d 551, 553–55, 557–58 (7th Cir. 1987) (defendant put assets in his sons' names; transferred his funds to a bank account in one son's name; dealt in cash; and paid his private creditors, but not the government); *United States v. Hook*, 781 F.2d 1166, 1168–70 (6th Cir. 1986) (defendant held no bank accounts or credit cards in his own name, instead conducting transactions in cash or using credit cards in other people's names, and put assets, including a house, in the names of his wife, children, and girlfriend); *United States v. McGill*, 964 F.2d 222, 227-29, 232-33 (3d Cir. 1992) (defendant kept his money in bank accounts held in the names of family members and coworkers). The facts leave no doubt that Melton engaged in a long, complex, multi-faceted effort to escape payment of his taxes.

In addition to denying that he intended to evade payment of taxes at all, Melton attempts to minimize the seriousness of his conduct in other ways. For one thing, he argues that this is a "very different tax evasion case" because he reported "every dollar" of his tax due. D.E. 43 at 1. The government has no evidence that Melton misled the IRS about the amount of taxes he owed. But 18 U.S.C. § 7206 applies to one who "willfully attempts in any manner to evade or defeat any tax imposed by this title *or the payment thereof* . . . ." (emphasis added). This language creates "two offenses: the offense of willfully attempting to evade or defeat the assessment of a tax as well as the offense of willfully attempting to evade or defeat the payment of a tax." *Kawashima v. Holder*, 565 U.S. 478, 488 (2012) (internal quotation marks and citation omitted). The fact that Melton reported his taxes due but evaded paying them means only that Melton committed the second of those two crimes

rather than the first. Either way, the perpetrator deprives the taxpayers of the money he owes, as Melton did.

In another effort to minimize the seriousness of his offense, Melton asserts that, before the criminal investigation began, he paid almost $600,000 of his tax debt, "almost half" of what he owed. D.E. 43 at 2. That assertion is, at best, seriously misleading. Melton *voluntarily* paid just $62,000. The IRS collected the rest through liens and levies, primarily on Melton's house. D.E. 27 ¶¶ 7, 27. Melton owed $2.1 million in February 2018, D.E. 27 ¶ 27, so he voluntarily paid less than 3% of his debt. And Melton's own words demonstrate that he had no desire or intention to pay his tax debt. When Castro asked Melton to make full payments of his taxes on February 18, 2020, Melton didn't express any desire to do so or any remorse at his long failure to pay almost anything voluntarily. Instead, he responded, "Not going to happen." And when Castro asked if Melton had a plan or intent to pay, Melton responded, "You tell me." D.E. 27 ¶ 47. These cavalier answers reveal Melton's state of mind far more reliably than the inaccurate representations in his sentencing memo. Similarly, shortly after meeting Castro, Melton emailed his accountant and asked when the civil statute of limitations would run on IRS's ability to collect his tax debts. GX 6 at 40278. Melton's own words demonstrate his cynical expectation that he could continue to stonewall and obfuscate until his tax debt expired. The seriousness of Melton's offense requires a lengthy term of incarceration. Melton's conduct went on too long, was too brazen, and cost the taxpayers too much money for a probationary sentence.

The Court must also consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Melton relies on his efforts to support his family and his pro bono work

as a lobbyist. D.E. 43 at 5–6, 18–19. Many of the factual allegations in these parts of Melton's memorandum are not supported by citations to or proffer of evidence. In at least one case, his representations appear to be misleading. Melton lists his alimony payments first among his examples of his family priorities. D.E. 43 at 5. Yet as of February 2017 he owed his ex-wife approximately $683,000 in unpaid alimony, GX 4 at 61115, 61257–60; *see also* D.E. 43 at 8 ("serious alimony arrears"); GX 5 at 25332 (Melton acknowledges paying less than half the alimony he owes). Furthermore, Melton was not prosecuted for stealing bread to feed his hungry family. He delayed selling his $1.3 million Coconut Grove home for six years, living in the house when the equity could and should have gone to taxpayers. Then he bought, through his wife, a new $680,000 house using money, again, that could and should have gone to the taxpayers. Melton himself admitted that his failure to pay the IRS was due not only to his family obligations, but also to his personal spending: When asked in the bankruptcy proceeding how he would pay his creditors—and his largest creditor by far was the IRS—Melton responded that he and his wife would have to "retreat significantly from our customary expenses." Melton did not suggest then that, by "customary expenses," he referred to court-ordered alimony, child support, and the like, nor is that a plausible interpretation of his words. Yet Melton apparently decided not to retreat from his expenses in the end, because made no substantial payments on his debt.

To the best the government can tell, Melton has indeed done significant pro bono work as a lobbyist, although Melton presents no evidence that he could have received over a million dollars for that work if he had requested it. D.E. 43 at 18–19. But Melton's work for these clients, however extensive, wasn't truly pro bono. On the contrary, he paid himself

$1.3 million taxpayer dollars, plus interest and penalties. In 2014, Melton wrote an op-ed piece opposing public funding of the Perez (f/k/a Miami) Art Museum, one of his former clients, and arguing that the museum "should get a mortgage loan just like struggling taxpayers." GX 10 at 28588.[8] Yet by that point, Melton had spent more than a decade happily appropriating public funding for himself, and refusing to tap into his own home equity on behalf of those same struggling taxpayers.

Melton also relies on another aspect of his history and characteristics, contending that he "has admitted to and fully accepts responsibility for his conduct." D.E. 43 at 2. The government agrees that Melton is entitled to a three-level adjustment for acceptance of responsibility based on his timely guilty plea. However, in imposing a sentence within the Guidelines incarceration range, the Court should consider his efforts to minimize his culpability. In his memorandum of law, Melton repeatedly mischaracterizes his offense as a mere failure to pay his taxes that occurred years ago, and attempts to deny his more serious criminal conduct, his "nefarious schemes to evade paying his taxes," which continued through at least 2021. Similarly, Melton's character witnesses repeatedly praise his remorse and acceptance of responsibility, but their letters make clear that Melton has not been truthful with them about what he did, which is surely the first sign of true remorse. *See* D.E. 41-1 at 10 (Melton's crime occurred "so many years ago" and consisted of "failure to pay his taxes"), 55 ("not undertaking . . . civil responsibilities"), 60 ("not paying taxes"), 61 ("he hadn't paid his taxes"), 62 ("he withheld payments on his taxes"). A sentence of home

---

[8] Incidentally, Mr. Melton's op-ed describes his work for the museum at length, but doesn't mention Mrs. Melton, although he now alleges that she did such work. *Compare* GX 10 *with* D.E. 43 at 17.

confinement for Melton, a defendant who has only minimally demonstrated acceptance of responsibility, would not be fair to those defendants who truly experience remorse.

The Court should also impose a significant sentence to deter others who seek to evade payment of their taxes. The Sentencing Guidelines expressly state that "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines," and that the sentence "should act as a deterrent to would-be violators." USSG Ch. 2, Pt. T, intro. comment. As the Eleventh Circuit has recognized, "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted). Melton's crime is precisely the type where deterrence is a primary consideration: He carried it out for almost 20 years and it became increasingly sophisticated and elaborate as he went on. Because of the nature of the crime, significant resources were required to detect, investigate, and prove the crime. As stated by the Sentencing Commission and the Eleventh Circuit, the Court should impose a sentence that effectively warns other offenders not to attempt the same thing. The variance requested by the defense would send other taxpayers considering schemes of tax evasion the message that they have a good chance to get away with it and, even if caught, they can look forward to probation. Such a message, and such a sentence, will not provide the necessary deterrence.

Section 3553(a)(4) also mandates that a district court consider the Sentencing Guidelines. The Supreme Court has explained that "[t]he Sentencing Guidelines represent the Federal Government's authoritative view of the appropriate sentences for specific crimes." *Peugh v. United States*, 569 U.S. 530, 545 (2013). In this case, a downward variance is not appropriate in light of Melton's serious, long-term conduct; the size of the tax loss; his efforts to minimize his culpability; and the need for deterrence of other tax offenders.

Melton also argues that he does not have the means to pay a fine, that the Court should not impose the sophisticated means adjustment, and that the Court should not order restitution. D.E. 43 at 12–16. The government addressed these arguments in our response to Melton's objections to the presentence report, D.E. 28 at 2–4, 5–8, and we adhere to our previous arguments.

WHEREFORE, the government respectfully recommends a sentence of 30 months' incarceration.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:  s/ Marc Osborne
Assistant United States Attorney
Court ID# A5500796
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel: (561) 209-1014
marc.osborne@usdoj.gov